## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,** : <br> **ex rel. IAN FOXLEY** <br> Park House, Sheriff Hutton <br> York, North Yorkshire YO60 6SX <br> United Kingdom <br><br>       Plaintiff/Relator, <br><br><br>      v. <br><br> **European Aeronautic Defence and Space** : <br> **Company EADS N.V.** <br> Mendelwag 30 <br> 2333 CS Leiden <br> The Netherlands <br><br>     - and - <br><br> **EADS North America, Inc.,** <br> 2550 Wasser Terrace <br> Suite 9000 <br> Herndon, VA 20171, <br><br>      Defendants. | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** <br><br><br> Civil Case No. _____ <br><br> **JURY TRIAL DEMANDED** |

## FALSE CLAIMS ACT COMPLAINT

Relator, Ian Foxley, on behalf of the United States of America, brings this action against

Defendants, European Aeronautic Defence and Space Company EADS N.V. ("EADS") and its

wholly-owned subsidiary, EADS North America, Inc. ("EADS N.A."),[1] for treble damages, civil

penalties and all other available relief under the United States False Claims Act ("FCA"), 31

---

[1]For purposes of convenience, EADS and EADS N.A. sometimes are referred to collectively in this Complaint as the "EADS Defendants" or "Defendants" or "EADS."

U.S.C. §§ 3729-3733, and alleges as follows:

## I.   **INTRODUCTION**

1.     The United States Government ("United States" or "Government") every year spends more than half a trillion dollars in military spending. It is the nation with the largest military expenditure, spending more than $711 billion last year and more than the next ten countries combined. Accordingly, the United States is the largest source of defense contracts and the largest market for defense companies such as EADS in the world.

2.     The United States is also a leading advocate against bribery and corruption, whether domestic or international, because of the adverse effects of such practices on democratic values, public accountability, the rule of law, and fair competition. Accordingly, the United States enacted, *inter alia*, the 1977 Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1 ("FCPA"), *et seq.*, the Anti-Kickback Act of 1986, 41 U.S.C. § 8701, *et seq.,* and the Money Laundering Control Act, 18 U.S.C. §§ 1956, 1957. The United States also is a strong supporter of the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions ("OECD Convention").

3.     Recognizing the significance of access to its military contracts, the United States generally requires voluntary international compliance with American and international anti-corruption laws and standards as the price of entry. For example, in March 2010, BAE Systems plc, a British defense company, admitted to making secret payments to influence various foreign government contracting decisions in Saudi Arabia, the Czech Republic, and Hungary. In addition to violating the disclosure requirements of American arms export control laws, BAE

Systems plc also was found to be in violation of its voluntary and repeated affirmations that it and its affiliates would comply with the FCPA and create and maintain adequate compliance mechanisms in all of its undertakings, including non-U.S. business transactions normally outside the statutory jurisdictional bounds of the FCPA.

4.     Likewise, upon information and belief, EADS entered into a similar agreement with the United States in which EADS and its affiliates agreed to comply with the FCPA and maintain adequate compliance mechanisms, even in non-U.S. business transactions, as a condition to grant EADS and EADS N.A., which is EADS' American affiliate, lucrative access to the American military contract market.  For example, EADS N.A. was just awarded a $181.8 million contract option to deliver certain helicopters in November 2012 to the U.S. Army and a $26.3 million contract to provide logistics support for a light utility helicopter program in January 2013 by the U.S. Army.

5.     As detailed below, notwithstanding EADS' assurances of its compliance with the FCPA and other pertinent statutes and regulations, since at least mid-2007, when EADS acquired GPT Special Project Management Limited ("GPT"), GPT has given kickbacks and payments to officials of the government of the Kingdom of Saudi Arabia ("Saudi Arabia") through cash, goods, and services to influence EADS' bidding for and the grant of government contracts by Saudi Arabia.  When alerted internally to these corrupt practices, EADS officers and senior management not only ignored the implications of this unsavory activity, but also evinced the firm view that the practices were acceptable methods to secure business, while attempting to "whitewash" the events giving rise to this serious misconduct.

6.     By making false statements about its and its affiliates' commitment to the FCPA and FCPA compliance mechanisms, as well as other pertinent statutes and regulations detailed below, EADS has violated the FCA and unlawfully influenced and distorted the Government procurement process. Had the United States been aware that EADS made false statements about its and its affiliates' commitment to the FCPA and FCPA compliance mechanisms, the United States would have awarded fewer or no contracts to EADS and its American affiliate, EADS N.A.

II.     **THE PARTIES**

7.     Relator, Ian Foxley ("Relator" or "Foxley"), is an adult resident of the city of York in the province of North Yorkshire, United Kingdom, and a citizen of the United Kingdom. Foxley was employed by GPT from June 2010 until December 2010 as the Programme Director for the modernization of the communications systems for the Saudi Arabian National Guard ("SANG"). As a result of his employment and position with GPT, Foxley became aware of the bribery and fraudulent acts and practices described herein. Relator first put the United States Government on notice of the allegations at issue herein in 2011 by filing a Form TCR (*i.e.*, Tip, Complaint or Referral) with the Securities and Exchange Commission ("SEC").

8.     EADS is a public limited liability company organized under the laws of the Netherlands, registered with the Registry of the Chamber of Commerce of The Hague under number 24288945 and listed in France, Germany, and Spain. EADS, with its subsidiaries (collectively, the "EADS Group"), is one of, if not the, premier aerospace and defense company in Europe, one of the top two manufacturers of commercial aircraft, civil helicopters, commercial

space launch vehicles and missiles, and a leading supplier of military aircraft, satellites, and defense electronics, with consolidated revenues of €49.1 billion (*i.e.*, approximately $73.5 billion) in 2011. EADS is the parent company of the EADS Group, and coordinates related businesses, sets and controls objectives and approves major decisions for the EADS Group. EADS acquired GPT in or about 2007.

9.     EADS N.A. is the wholly-owned U.S.-based subsidiary of EADS, headquartered in Herndon, Virginia. The company provides, *inter alia*, products and services related to fixed- and rotary-wing aircraft, homeland and cyber security, telecommunications, defense electronics and avionics, and services. A significant source of revenue for EADS Group is EADS N.A. which, in 2011, received revenues from the Government of approximately $8.775 billion had order intake of approximately $52.5 billion and booked orders of approximately $140 billion.

## III.   SOURCE OF RELATOR'S ALLEGATIONS

10.     The information related in this Complaint is derived from the original and first-hand knowledge and information of Relator, supplemented by additional factual investigation by his counsel. Prior to the filing of this Complaint, Relator, through his counsel, advised the United States that he would be filing a complaint and apprised the United States of his allegations.

## IV.   JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 31 U.S.C.§§ 3729-33 (the FCA).

12.     This Court has personal jurisdiction over the parties because all Defendants

transact business in the District of Columbia and have done so at all times relevant to this

Complaint (the "relevant period" or "relevant time period").

13.     Venue is proper within this District pursuant to 31 U.S.C. § 3732(a) and 28

U.S.C. § 1391(b)(2) because all Defendants transact business in the District of Columbia and a

substantial part of the events giving rise to the claims occurred within the District.

## V.     FRAUDULENT CONCEALMENT - TOLLING OF STATUTE OF LIMITATIONS

14.     To cover up the scheme and actions described in this Complaint, EADS and

EADS N.A. took affirmative actions to conceal GPT's kickbacks and the wrongful payments to

Saudi Arabian government officials, remained silent when required to speak, and failed to

disclose material facts despite their duty to do so under the statutes, regulations, and terms

governing the United States' agreement with EADS and under the FCA.

15.     Because EADS withheld and concealed all information about the kickbacks GPT

provided, the Government was prevented from discovering EADS' false claims, despite an

exercise of reasonable care and diligence.

16.     At all material times and throughout the relevant time period (since at least 2007,

if not beforehand), EADS had knowledge of its actions and of the facts giving rise to the claims

asserted in this Complaint.

17.     Relator is the original source of the information contained in this Complaint.

Prior to the filing of this Complaint and/or without the knowledge of Relator, the Government

did not know of the facts surrounding EADS' false claims and GPT's corrupt practices, and, in

the exercise of reasonable care and diligence, could not have known of EADS' false claims and

GPT's corrupt practices or of the injuries that the Government had suffered as a result of EADS' false claims.

## VI.   AGENCY ALLEGATIONS

18.     GPT's and EADS' other employees and officers were the agents, servants, employees, successors, assignees, transferees, and/or joint venturers of EADS, and each was, as such, acting within the course, scope and authority of said agency, employment, and/or joint venture and was acting with the consent, permission, and authorization of EADS.  EADS ratified and approved all actions in furtherance of the scheme alleged in this Complaint by such agents, servants, employees, successors, assignees, transferees, and/or joint venturers.

## VII.   GOVERNING STATUES AND REGULATIONS

19.     During the relevant time period, Defendants entered into contracts and subcontracts with the United States, the terms of which, and by virtue of controlling laws and regulations, required them to comply with the FCA, organizational conflict of interest laws and other federal acquisition regulations, the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778 *et seq.* and its implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. § 120 *et seq.*, the U.S. Money Laundering Control Act ("MLCA"), 18 U.S.C. §§ 1956, 1957, and the FCPA.   Those laws and regulations provide as follows:

a.      **The False Claims Act.**  The FCA provides that:

(1) Any person who -

(A) knowingly presents, or causes to be presented, to the United States Government a false and fraudulent claims for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or

statement to get a false or fraudulent claim paid or approved by the Government;

(C) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;

* * *

is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000], plus 3 times the amount of damages which the Government sustains because of the act of that person.
. .
(b)(1) For purposes of this section, the terms "knowing" and "knowingly"

(A) mean that a person, with respect to information - -

    (i)    has actual knowledge of the information;

    (ii)    acts in deliberate ignorance of the truth or falsity of the information; or

    (iii)    acts in reckless disregard of the truth or falsity of the information, and

(B) require no proof of specific intent to defraud.

    b.    **Organizational Conflicts of Interest.** 48 C.F.R. 9.505, provides, among other things, that:

The general rules in 9.505-1 through 9.505-4 prescribe limitations on contracting as the means of avoiding, neutralizing, or mitigating stated situations . . . Each individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract.  The exercise of common sense, good judgment, and sound discretion is required in both the decision on whether a significant potential conflict exists and, it if does, the development of an appropriate means for resolving it.  The two underlying principles are -

(a)    Preventing the existence of conflicting roles that might bias a contractor's judgment; and

(b)     Preventing unfair competitive advantage.  In addition to the other situations described in this subpart, an unfair competitive advantage exists where a contractor competing for award of any Federal contract possesses -

(1)     Proprietary information that was obtained from a Government official without proper authorization; or

(2)     Source selection information (as defined in 2.101) that is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract.

c.     **Arms Export Control Act and International Traffic in Arms Regulations -** The AECA and ITAR prohibit the export of defense-related materials to a foreign national or a foreign nation without the required U.S. government license, and the Department of State has the power to approve or deny such applications. As part of the licensing scheme, applicants are required to identify associated commissions to the State Department -- whether they are legitimate commissions or bribes -- paid to anyone who helps secure the sales of these defense materials.  By failing to disclose the bribes and other payments at issue in this Complaint, EADS violated AECA and ITAR because, upon information and belief, the systems deployed by EADS in Saudi Arabia, as part of the projects detailed below, contained technical data and other sensitive information and technology subject to the requirements of the AECA and ITAR.

d.     **U.S. Money Laundering Control Act -** The MLCA establishes liability for individuals and entities that, *inter alia*, conduct transactions knowing that the proceeds involved were derived from unlawful activity or with the intent to promote some unlawful activity.  As explained below, EADS violated the MLCA by transferring certain of the unlawful funds at issue

from HSBC Banks in Saudi Arabia to London, England and then New York, New York before transferring the same to bank accounts in the Cayman Islands operated by entities that were utilized to facilitate the bribes and other unlawful payments at issue.

e.  **Foreign Corrupt Practices Act** - The FCPA makes it unlawful for a U.S. person, and certain foreign issuers of securities, to make a payment to a foreign official for the purpose of obtaining or retaining business for or with, or directing business to, any person. The FCPA also applies to foreign firms and persons who take any act in furtherance of such a corrupt payment while in the United States. As a condition to securing contracts from the United States Government, upon information and belief, Defendants represented and certified that they were acting in compliance with the FCPA.

## VIII.  FACTUAL ALLEGATIONS

### A.  Background Of GPT And The LOA3P3 SANGCOM Project

20.  GPT is a UK-registered company, registered at Companies House London reg no: 2984211, and is a wholly-owned and consolidated third-tier subsidiary of EADS. EADS acquired GPT in March 2007, where it is held from an operational perspective within Astrium Services, which is part of the EADS Group. Astrium Services is the EADS subsidiary responsible for secure communication and geo-information. GPT is a prime contractor that offers design and build for capital replacement projects of communication systems, including associated management services. GPT's sole customer is the United Kingdom Ministry of Defence ("UK MOD"), which is represented in Saudi Arabia by the UK MOD Saudi Arabian National Guard Communications team ("SANGCOM").

21.     In 1978, the British and Saudi Arabian governments reached a Memorandum of
Understanding creating a British Loan Service Team, SANGCOM, to assist the SANG Signal
Corps to establish and maintain a modern and nationwide communications infrastructure.  In
connection with SANGCOM's mission, the two governments entered into an agreement known
as the Letter of Offer Assistance ("LOA").  The mission has continued to this day largely
unchanged, which is essentially to set up major equipment procurement programs to meet the
operational requirement of SANG.

22.     GPT first established its name and brand with the Saudi Arabian government after
it was awarded a contract for the delivery of a card phone system throughout Saudi Arabia in
1992.  Since 1995, GPT has been awarded a series of back-to-back Operations, Maintenance and
Training ("OMT") work by the Saudi Arabian government, each with a three year duration, the
most recent one of which took effect in early 2010.

23.     In or about late 1997 and early 1998, GPT was awarded the Letter of Offer
Assistance 3 ("LOA3") contract valued at SAR (Saudi Arabian Riyal) 1,207 million
(approximately $325.89 million based on January 22, 2013 exchange rates) for the delivery of a
modern digital communications network for SANG.  In 2005, GPT was awarded an extension to
LOA3, known as LOA3+, valued at SAR 745 million (approximately $201.15 million based on
January 22, 2013 exchange rates), for further work.  But, by 2009, it became apparent that rapid
advances in telecommunications technology, especially concerning the Internet, were rendering
the existing network obsolete, and negotiations began for further upgrades.

24.     In February 2010, GPT was awarded a single-source contract, or a contract where

it was the only supplier invited to tender, for extensive upgrades under the Letter of Offer Assistance 4 proposal, which was renamed the Letter of Offer Assistance 3 Phase 3 ("LOA3P3") at the behest of certain Saudi Arabian government officials.  The Saudi Arabian Government allocated SAR 9.976 billion (approximately $2.694 billion based on January 22, 2013 exchange rates) for the ten-year project, which would begin in earnest in the second half of 2010.

25.    At the same time that GPT received its extremely lucrative contract without competition, defense companies around the world were preparing for or undergoing extensive cutbacks due to defense budget cuts from the global recession.

**B.    Relator's Involvement In The LOA3P3 SANGCOM Program**

26.    In May 2010, Foxley, a retired British Army Officer in the Royal Corps of Signals working in the defense communications industry, responded to GPT's newspaper advertisement searching for a Programme Director for the LOA3P3 Program.  After a series of interviews culminating with a personal interview with Jeffrey Charles Cook ("Cook"), the Managing Director of GPT, and Princess Noura bint Saad of Saudi Arabia ("Princess Noura"), GPT's Human Resources Director, Foxley executed an employment contract with GPT on June 16, 2010, and began working for GPT soon thereafter.

27.    After working out of GPT's office in Bristol, United Kingdom, while awaiting the necessary security and visa clearances to work in Saudi Arabia, and a brief visit to Saudi Arabia between June 27 and July 1, 2010 to make initial contacts and for purposes of introductions, Foxley relocated to GPT's office in Riyadh, Saudi Arabia on July 28, 2010 to begin immediate involvement in the LOA3P3 Program.

28.     As the Programme Director, Foxley was responsible for and in control of the operational project management of the LOA3P3 Program.  He was to implement the projects necessary to achieve the objectives outlined for the Program using the required governance processes and procedures and to deliver those projects in line with SANGCOM and SANG's expectations.  In short, he was to provide the tactical leadership to reach the overall strategic goals set forth by the Program.

29.     Unbeknownst to Foxley at the time, his immediate predecessor, Eddie Fisher, had been forced to resign in April 2010 after three months of employment because of his growing discomfort with the corrupt and unethical practices engaged in by members of GPT's senior management team.  Due to certain retaliatory tactics practiced by members of GPT's senior management that Foxley would eventually discover, including the withholding of passports and threats to physical safety, Eddie Fisher was forced by GPT to resign and sign a confidentiality agreement at the time of his departure.

C.      The Red Flags

30.     The sole objective of the GPT senior management was to extract the most appropriations from the total-allocated LOA3P3 Program budget of SAR 9.976 billion as fast as possible, regardless of the suitability or feasibility of the project, or the means.  This attitude became visible in Relator's first briefing with GPT senior management in July 2010, the July Business Unit Review, prior to Relator assuming his role in Riyadh.  During the briefing, the GPT senior management emphasized a target of SAR 500 million worth of contracts by the end of November 2010 and the completion of the three active equipment projects for a portable field

headquarters with advanced telecommunication technology that would provide fast revenue but limited benefits to the overarching LOA3P3 Program purpose of upgrading Saudi Arabia's actual infrastructure.

31.     The possibility of achieving that SAR 500 million target without disregarding standard and appropriate planning and governance processes was highly doubtful because of the short time-frame and the infancy of the LOA3P3 Program, which meant specific projects still needed to be developed and organized.  The implications of GPT's conduct were obvious.  GPT simply was interested in generating revenue in a speedy manner, regardless of whether such revenue was associated with appropriate and scheduled deliverables with respect to the ultimate object of the LOA3P3 Program.

32.     In line with GPT's attitude toward extracting the most revenue, there was no budget or financial model set for the program management team that was to analyze and develop potential projects.  This is highly unusual and contrary to common practice in project management, since the lack of parameters for an administrative and logistical foundation and an ad-hoc approach toward project planning would render execution, at best, unsteady and without focus.

33.     Upon Relator's inquiry regarding the available budget for him to set up his team, Laurence Bryant ("Bryant"), GPT's Chief Financial Officer, informed him that there was no budget allocated for that purpose and that a financial model was not even included in the bid, and referred him to the Programme Director for the LOA3+ Program, Sam McElreavey, for guidance. However, the LOA3+ Programme Director was unwilling (or unable) to provide the project

-14-

management budget or model. After Relator's requests, however, the Programme Director did provide a cost control tool.

34.     GPT enforced a strict non-disclosure policy regarding the extent and size of the LOA3P3 Program, despite the fact that it would assist EADS Group to announce its success in securing this lucrative work in the midst of a global recession that was significantly hampering EADS' competitors.

35.     On September 20, 2010, in an executive meeting attended by all members of the GPT executive team except for Bryant, who was in the United Kingdom, Cook remarked during his update to the attendees, that the commanding Saudi general was the perfect customer, signing everything that was put in front of him, and then made a side comment to the GPT Commercial Director that this was unsurprising in light of the "BIS," short for "Bought In Services." Relator was unaware of the meaning of the "BIS" reference at the time, but the significance of this reference would soon become clear to him.

**D.     The Sub-Contracting Process And "Bought In Services"**

36.     The life cycle for acquisition projects in at least the LOA3P3 Program and the LAO3+ Program followed three basic phases: the Proposal Phase, which ran from definition of the requirement through design and development of a suitable location, selection of a suitable sub-contractor through a competitive tendering process to a recommendation to SANGCOM, which would brief the commanding Saudi general with a recommendation for supplier and price.

37.     A short iterative process of confirmatory questioning would follow, and the commanding Saudi general would then make a decision and, if in the affirmative, the contract

would be awarded and the project would enter into the Implementation Phase. The Implementation Phase is straightforward project management to timed milestones and full delivery of the contracted capability.

38.     The final phase was Operations, Maintenance, and, eventually, Disposal of obsolete or replaced equipment.

39.     Funds are only released on contract award, delivery of milestones, and full delivery in the Implementation Phase, so GPT drove to push through the Proposal Phase as swiftly as possible to get revenue flowing to it.

40.     The key documents in the Proposal Phase were the Commercial Technical Proposal (CTP), which detailed the technical solution and its feasibility in meeting the operational requirement, and the Change Proposal (CP), which provided a financial summary and an itemization of funds requested. The categories of the itemization included Equipment and Services, which were broken down further into each equipment or service, a general Bought-In-Services line, the Prime Contractor's Charges, and a Total Price Payable.

41.     Each document required the sign-off from the Deputy Commercial Director, the relevant Programme Director for either the LOA3+ or LOA3P3 Program, the Chief Engineer, the Commercial Director, and the Chief Financial Officer. Unlike other documents, these were never left at Relator's desk to sign and return, but always personally hand-delivered by the Commercial Director or the Deputy Commercial Director for immediate signing and processing.

42.     The amounts allocated to "Bought In Services" was unusually significant, ranging from at least 7.5% to 16% of the total contract price. For example, of the three LOA3P3 projects

signed off between September and November 2010:

      a.      Fibre 1A: SAR 31.8m with a BIS element of SAR 2.4m

      b.      Power Upgrade Priority 2: SAR 49m with a BIS element of SAR 7.84m

      c.      Al Qatif Ranges: SAR 15m with a BIS element of SAR 3.9m.

43.     The BIS element for one approved in December 2010 reflected a similarly significant "BIS":

      - Staff Working Environment (Initial Operating Capability): SAR 77.7m with a BIS element of SAR 9.6m.

44.     After Cook's September 20, 2010 remark about how the commanding Saudi General was the "perfect customer" because of the BIS, Relator began making inquiries as to what BIS constituted.  According to the Deputy Commercial Director, "Bought In Services" were just the costs for purchasing "purchasing things if we don't have them in house," and to ask Cook or Bryant if Relator wanted more details.  However, as Relator would later discover, "Bought In Services" was actually an internal code name for kickbacks to Saudi officials for approving these sub-contracts.

E.    **Tensions Develop With GPT As Relator Challenges The Ethics Of GPT**

45.     At the September 20, 2010 meeting where Cook made his BIS remark concerning the commanding Saudi General, Relator had also made a statement to all executives present addressing completely inaccurate assertions by a member of Parliament and a Russian academic website that associated Relator with the corruption scandal that led to the conviction of Relator's father, Gordon Foxley, the former Director of Ammunition Procurement in the U.K. Ministry of

Defence. Relator declared that, given his family history and the damage such practices could impose on a wide range of people, including the effect it had on his career as a Royal Signals Officer, he was adamantly opposed to any government corruption and bribery.

46.     Two days later, on or about September 22, 2010, during an unrelated visit to Cook's office, Cook unexpectedly informed Relator of a problem GPT employee, Mike Paterson ("Paterson"), the existence of whom, at this point in time, Relator was unaware. According to Cook, Paterson was a "madman" who was making "wild accusations, even to the extent that someone had threatened to kill him," and Cook advised Relator to steer clear of Paterson if he [meaning Paterson] attempted to communicate with Relator or involve Relator in any of the allegations.

47.     Relator inquired as to the nature of Paterson's allegations, to which Cook responded by asking Relator if he had yet come across "BIS," and explained that "BIS" was necessary to make things happen in that part of the world. When Relator further inquired if "BIS" was in any way corrupt and reiterated his earlier declaration at the executive meeting of his strict stance against corruption, Cook reassured Relator that it was legal and merely part of normal business practice in that part of the world. Cook directed Relator to concentrate on getting the LOA3P3 Program up and running and leave the other issues to himself, Bryant and Moody to sort out.

48.     Later in September, Relator inquired from his opposite number in SANGCOM, the Head of Delivery, with whom Relator maintained good relations in an effort to create a transparent and cooperative system with SANGCOM, whether he was aware of BIS. The Head

of Delivery replied in the negative, but two days later, he mentioned to Relator that the subject of

a SANGCOM meeting earlier that morning was BIS.

49.     It soon became clear to GPT's senior management that Relator was asking too

many questions, too focused on transparency with SANGCOM, and likely not ethically or legally

flexible enough for the duties they envisioned for the LOA3P3 Programme Director.  On October

4, 2010, Relator was summoned to Cook's office for an appraisal meeting with Cook and

Princess Noura, who informed Relator that his probation period was now extended to six (6)

more months, with a parting instruction to, "keep your mouth shut, stop talking to other

companies and people you know and focus only on the Programme and getting things onto

contract."

50.     In the meantime, relations between GPT and SANGCOM began to deteriorate

rapidly, as SANGCOM was not agreeing to place the LOA3P3 subcontracts GPT wanted before

the Saudi officials as readily and rapidly as GPT desired.  At the end of November 2010, Cook

summoned Relator to his office once more, harangued him about missing the targeted contract

revenue, and commented that he would get the commanding Saudi General to pressure the U.K.

Ministry of Defence to move at a rate more satisfactory to GPT.

51.     By December, 2010, GPT's senior management clearly was ready to replace

Relator with a more amenable Programme Director who was more ethically "flexible," who

would cease asking questions and who would proceed to obtain revenue for GPT regardless of

whether allegedly associated work was designed to accomplish ultimate Programme objects.  On

December 4, 2010, all of GPT's executives were called in to a meeting, whereupon Cook openly

blamed Relator for failing to meet the November target contract revenue. In a subsequent private meeting right afterwards, Cook offered Relator the option of either leaving quietly, with the implication of being fired for disgrace or failure, or resigning on the pretext of family reasons.

52.     On December 5, 2010, a senior employee of GPT's HR department repeatedly requested that Relator turn in his passport for "safekeeping," which appeared to form the basis for an attempt to prevent Relator from leaving Saudi Arabia without first agreeing to GPT's terms. Relator subsequently discovered that this tactic was employed against his predecessor as well.

53.     Fearing for his safety, Relator requested advice and counsel from the U.K. Ministry of Defence. Relator discussed his suspicions with SANGCOM officials that GPT was conducting unlawful and unethical activities, but he was informed that his suspicions would not be credible without any evidence and that SANGCOM would take action if he had evidence. Remembering Cook's concern over Paterson's allegations, Relator decided to contact Paterson on December 5, 2010 (whom he still had not met) to see if Paterson could shed more light on GPT's practices so that Relator could determine how to ethically and legitimately perform his duties and understand exactly what Paterson had alleged (and the outcome of the same). Relator and Paterson had not met during Relator's less than six (6) months in Saudi Arabia, in part because Paterson worked on a different floor from Relator and, at that stage in performing his duties, it had not been necessary for Relator to have contact with Paterson. Coincidentally, Relator and Paterson (along with his wife and young child) lived in the same apartment complex in Riyadh and, although they did not know each other personally or ever interact socially, they

did know each other by sight.  When Paterson agreed to meet Relator on the evening of

December 5, 2010, he simply walked across the apartment complex where Relator and Paterson

both lived and visited Relator at his apartment that evening.

**F.**     **The Kickback Scheme Confirmed**

54.     Relator's suspicions over the irregularity of the "Bought In Services" were

confirmed on the evening of December 5, 2010 when he met Paterson for the first time.  At this

meeting with Paterson, who had been GPT's Financial Controller since 2007, Paterson revealed

the kickback scheme in place for the LOA3+ Program.

55.     Paterson also explained to Relator that, beginning in 2007, Paterson began

expressing concerns regarding the business practices of GPT.  Moreover, in June 2009, Paterson

initiated a formal EADS internal complaint to report suspicious transactions executed by GPT

directors and Paradigm Services, the immediate parent to GPT.  Specifically, Paterson primarily

identified two issues in his 2009 internal report:

      a.     Consistent payments earmarked as "Bought In Services" to Simec
International Ltd. ("Simec"), a Cayman Islands Company that was
ostensibly a supplier or subcontractor, when there was no record of any
goods or services that Simec provided in return; and

      b.     The purchase of luxury SUVs that were outright gifted to individuals
outside the company and subsequently written off.

56.     In addition to those suspicious transactions identified in Paterson's original 2009

report, the following activity also gave rise to significant concerns regarding the integrity of

GPT's business practices:

      a.     The dubious rental terms of a villa for Cook paid by GPT, which was
extremely generous and provided above-market rental rates to a landlord

who was a SANG officer, believed to be the Commanding General of the
SANG Signals Corps;

b.    Jewelry gifts to Saudi nationals; and

c.    Gross overspending on allowances to flights to New Zealand for the
personal use of the Operations Director.

57.    Paterson had remained with GPT after his complaints beginning in 2007 and his

internal report in 2009, but his duties were substantially removed afterwards. He declined to

provide supporting documentary evidence to Relator due to his ongoing negotiations with the

Compliance arm of EADS Group, which provided for a confidentiality agreement, and because

of fears for his own personal safety, as well as that of his young family. Paterson's internal

complaints were eventually resolved by EADS by (a) denying the existence of the corruption that

Paterson uncovered, (b) entering into an agreement with Paterson pursuant to which Paterson

was paid compensation in return for his confidentiality (*i.e.*, effectively "hush money"), and (c)

Paterson was promoted and moved to a different post in the Middle East. In other words, in the

final analysis, EADS purchased Paterson's silence. To this day, Paterson continues to work for

EADS.

58.    Although Paterson refused to provide Relator with documentary evidence

regarding the corruption he had uncovered, Paterson did advise Relator that Paterson had kept the

materials on GPT's computer system. Believing that it was necessary to act to ensure that such

evidence was not destroyed, the very next day, on December 6, 2010, Relator, in his position as

Programme Director, instructed GPT's Deputy IT Manager to provide him with access to

Paterson's electronic files and documents, based on Relator's explanation that Paterson's

materials were necessary for a meeting with Cook. In this manner, Relator obtained access to certain documentary evidence that confirmed the fraudulent conduct at issue. Upon discovery of these documents, Relator immediately transmitted the evidence to his other (personal) email account and to his opposite number in SANGCOM.

59.     The documentary evidence recorded specific transactions to Simec, as well as an additional Cayman Islands entity, Duranton International ("Duranton"), under invoices for LOA3+ and OM&T contracts, with approvals and authorizations signed by Cook, Bryant, and Malcom Peto ("Peto"), the Managing Director of a division of Paradigm Services and Cook's immediate superior.

60.     Upon information and belief, the same type of transactions can be traced to invoices for the LOA3P3 Program.

61.     There was also documentary evidence recording the transactions and costs of the "gift" vehicles.

62.     Moreover, the documentary evidence demonstrated extensively that GPT's overall superiors within EADS Group were or became cognizant of these practices, but did nothing except apply a coat of whitewash to avoid discovery and disruption of GPT's operations in Saudi Arabia.

**G.**     **Documentary Evidence Showed That EADS Group Turned A Blind Eye**

63.     Paterson had been opposed to the Simec payments since mid-2007, first reporting his discomfort to Peto at that time. Paterson also made his discomfort clear to both Cook and Bryant. Peto, Cook and Bryant all effectively dismissed Paterson's concerns.

64. By November 2009, Paterson's concerns reached Philippe Troyas ("Troyas"), Astrium Services' International Compliance Officer. Troyas assured Paterson's physical safety, at least from EADS Group, but also disclosed that he was prepared to accept some corruption if it gave EADS Group or Astrium Services an edge over an American or German competitor. Troyas also communicated that top Astrium Services officers, including CEO Eric Beranger ("Beranger") and then-CFO Thomas Muller, were aware of the situation but of the same view as Troyas, and, thus, were undisturbed by the implications of the information Paterson had discovered.

65. On June 28, 2010, Paterson relayed his conversation with Troyas to Pedro Montoya ("Montoya"), EADS Group Chief Compliance Officer, Oliver Brun, and Anne Longchamp, Astrium Services Vice President of Risk Control. Montoya and Jacques de Cordemoy ("de Cordemoy"), the Chief Compliance Officer of Astrium, met with Paterson on July 20, 2010 to discuss Paterson's concerns, but ignored him afterwards.

66. In July 2010, upon KPMG U.K.'s request for information in preparation for the annual audit, Paterson relayed his concerns regarding the Simec payments and the luxury SUV vehicle "gifts." When an audit team arrived in Riyadh in late September 2010, however, the audit team ignored Paterson, failing to interview him or to audit the documents he had ready for them. Morever, the audit team, which, upon information and belief, included representatives of KPMG U.K., stayed mostly cloistered in a conference room and never even interviewed Relator, even though he was one of the five or six most senior personnel at GPT in Saudi Arabia amongst a total staff of over 300 personnel.

67.     Following the arrival of the KPMG U.K. audit team, Paterson provided further information regarding GPT materially suppressing its reported profits so that the profits matched GPT's margin against the agreed-upon levels set by SANGCOM, to Montoya and de Cordemoy so that they could bring that information to the auditors.  Both Montoya and de Cordemoy continued to ignore Paterson and did not relay the requested information to the auditors.

68.     In the meantime, Paterson was expressing his frustration at the lack of progress and attention toward his complaints to Peter Cheney ("Cheney"), another Astrium employee and the senior union representative in Astrium, and mentioned that he was inclined to disclose the information to U.K.'s Serious Fraud Office.  Cheney advised Paterson to continue to keep his head down to see if there would be an acceptable internal resolution, especially because of the contemporaneous EADS N.A. bid to build aerial tankers for the United States Air Force.

69.     Indeed, after it became clear to EADS that Relator would not cooperate or accede to the unlawful conduct at issue, when Relator fled Saudi Arabia in fear for his personal safety, returned to the United Kingdom and confronted de Cardemoy, who is based in Europe, with this information in late January 2011(as detailed fully below).  de Cardemoy informed Relator that the October 2010 internal audit by KPMG U.K. cleared GPT and, thus, EADS of any wrongdoing.  The circumstances of this "audit" demonstrate that it was designed to clear GPT and EADS of malfeasance, as opposed to uncovering the corrupt conduct that was plainly occurring within EADS on a systemic level.

70.     The payments to the two Cayman Islands entities identified above occurred through HSBC Bank and, specifically, were routed through HSBC Bank in New York, in

violation of the MLCA.

**H.     Relator's Escape To The U.K. And Debriefing With EADS**

71.     On the afternoon of December 6, 2010, Cook summoned Relator to his office,

with Princess Noura in attendance.   Cook asked whether Relator had been sending documents to

SANGCOM, and what documents were sent.   When Relator replied that he sent the documentary

evidence gathered through Paterson, Cook accused Relator of "hacking," upon which Relator

explained that he informed the Deputy IT Manager of his intentions prior to access.   Cook

accused Relator of theft of company information and that, in Saudia Arabia, he [meaning Cook]

could call the police and have Relator arrested and jailed.   Relator responded that the information

was about corrupt practices and that he [meaning Relator] had a duty to disclose such

information.   Relator explained that the only responsible people to whom he could give the

information, at that point in time, was the UK MOD SANGCOM team who were GPT's

customers and who ought to be aware of such privileged information.   Cook then threatened

Relator with jail, with Princess Noura's support, and instructed Princess Noura to ensure that the

transmission of documents stopped.   As Cook continued on his tirade, Relator, fearing for his

safety once more after the threat of Saudi Arabian jail with the present support of a Saudi

Princess, excused himself without Cook's permission and left directly for the SANGCOM

compound.

72.     Once at the SANGCOM compound, he was advised by the SANGCOM officials

to exit Saudi Arabia that night before any potential holds or stops could be placed on Relator's

visa.   On the night of December 6, 2010, with a SANGCOM escort to the airport, Relator

boarded a plane back to the United Kingdom.

73.    A few days after his return to the United Kingdom, Relator, who was still officially the LOA3P3 Programme Director, requested a complete list of suppliers from one of his Senior Project Managers, with confirmation that the list was indeed complete by the Commercial Director.  Relator then contacted Bryant, requesting payment figures to the suppliers, and also asked the Commercial and Financial Directors for the outputs and deliverables of the Bought In Services and the names of the suppliers.  Bryant replied that these figures were of no concern to the Programme Director, even though performance, cost, and time was an essential metric for a Programme Director to consider when performing his duties. Relator then asked Bryant about the two purported Cayman Islands subcontractors, Simec and Duranton, to which Relator received no reply.

74.    Two days after that exchange, Relator met with Montoya and de Cardemoy at the EADS Headquarters in Paris, disclosing his findings about "Bought In Services" and GPT's practices.  Relator was informed that someone would contact him in January 2011.

75.    During December, 2010, after he fled Saudi Arabia, individuals at GPT continued to approve contracts and expenditures, while indicating that Relator had approved the same as Programme Director, even though Relator had provided no such approval.

76.    In late January 2011, Relator met with de Cardemoy and Philip Benoit, the HR Director for Astrium Services, to discuss his employment status and his allegations.  There, Relator was informed that the October 2010 internal audit of GPT by KMPG U.K. had sufficiently demonstrated that no wrongdoing had taken place, a conclusion decided by Astrium

Services CEO Beranger.

I.    **EADS' Agreement With The United States To Abide By The FCPA For Non-U.S. Business Transactions**

77.    Upon information and belief, as a condition to doing business with the United States, EADS agreed to abide by the terms of the FCPA, AECA, ITAR and MLCA and certified to the United States that it was abiding by the terms of those statutes and regulations, as well as had systems and adequate internal controls to ensure compliance with the same.

78.    Upon information and belief, EADS agreed to abide by the FCPA and knowingly and willfully failed to identify bribes and other unlawful payments to third parties and Saudi Arabian government officials for assistance in soliciting, promoting or otherwise securing sales of defense items, in violation of the FCPA, AECA, ITAR and MLCA, and also violated the FSA by its false certifications with respect to compliance regarding the same.

## COUNT I

79.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

80.    Defendants have violated the provisions of the False Claims Act, 31 U.S.C. §§ 3729-3732 because Defendants knowingly presented, or caused to be presented, a false or fraudulent certification to the United States, knowingly made, used, or caused to be used, a false record or statement to a false and fraudulent claim, and conspired to commit such violations. By engaging in the challenged conduct detailed in this Complaint, Defendants also violated the FCPA, AECA, ITAR and MLCA.

81.    The United States, whether directly or indirectly, contracted with and remitted

payment to Defendants, unaware of the false nature of such claims. Had it been aware of the false nature of such claims, the Government would not have contracted with Defendants or remitted payments to Defendants.

82.     By reason of these actions and payments, the United States has been damaged in substantial amounts and Defendants should be required to pay such damages, and provide restitution in the amount of and disgorge all funds received from the Government during the relevant period. The exact amount of such damages and monies is to be determined based upon further investigation and calculation of appropriate damages and relief.

## PRAYER

Wherefore, Relator respectfully requests that this Court enter judgment against Defendants as follows:

(a)     That the United States be awarded damages and corresponding relief in the amount of each and every false or fraudulent claim, including all funds received by Defendants from the United States Government during the relevant period, multiplied as provided for in 31 U.S.C. § 3729(a), plus civil penalties and statutory damages, including treble damages, to the maximum extent allowed under the False Claims Act;

(b)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator's counsel necessarily incurred in bringing and pressing this case;

(c)     That Relator be awarded the maximum amount allowed pursuant to the False Claims Act; and

(d)     That the United States be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Relator, on behalf of the United States of America, hereby demands a jury trial on all claims so triable.

Dated: January 28, 2013

_____
Scott R. Shepherd (DC Bar #WI0028)
SHEPHERD, FINKELMAN, MILLER &
SHAH, LLP
35 East State Street
Media, PA 19063
Telephone: 610/891-9880
Facsimile: 610/891-9883
Email: sshepherd@sfmslaw.com

Eric L. Young
Peter Lennon
Brandon Lauria
YOUNG LAW GROUP
23 S Broad St #1920
Philadelphia, PA 19109
Tel: 215/367-5151
Fax: 215/367-5143
Email: eyoung@young-lawgroup.com
        plennon@young-lawgroup.com
        blauria@young-lawgroup.com

James E. Miller
Laurie Rubinow
SHEPHERD, FINKELMAN, MILLER &
SHAH, LLP
65 Main Street
Chester, CT 06412
Telephone: 860/526-1100
Facsimile: 860/526-1120
Email: jmiller@sfmslaw.com
        lrubinow@sfmslaw.com

Kolin C. Tang
SHEPHERD, FINKELMAN, MILLER &
SHAH, LLP
401 West A Street, Suite 2350
San Diego, CA 92101
Telephone: 619/235-2416
Facsimile: 619/234-7334
Email: ktang@sfmslaw.com

**Counsel for Relator And
On Behalf of The United States of
America**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on the following on this 28th day of January, 2013, pursuant to Fed. R. Civ. P. 4 and the United States False Claims Act.

**Via Certified Mail, Return Receipt Requested**
Eric C. Holder, Jr.
Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001
**Attn: False Claims Act Filing**


Ronald C. Machen, Jr.
U.S. Attorney for the District of Columbia
55 4th Street, NW
Washington, D.C. 20530

Scott R. Shepherd
Shepherd, Finkelman, Miller & Shah, LLP
35 E. State Street
Media, PA 19063
Tel.: 610-891-9880
Fax: 610-891-9883
sshepherd@sfmslaw.com